UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEVE M. BISHOP,

        Plaintiff,

                                     Civil No. 09-12182
                                     Hon. John Feikens

        v.

GOSIGER, INC.,

        Defendant.

_____

## OPINION AND ORDER REJECTING MAGISTRATE JUDGE MAJZOUB'S REPORT AND RECOMMENDATION [30] AND GRANTING DEFENDANT'S MOTIONS TO STAY PENDING ARBITRATION [8 AND 23]

## I. INTRODUCTION

On June 5, 2009, Plaintiff Steve M. Bishop ("Bishop") filed a twelve-count Complaint against Defendant Gosiger, Inc. ("Gosiger"), an Ohio corporation, for alleged underpayment and nonpayment of commissions. (Dkt. 1). Bishop began working as a distributor for Gosiger in 2001 pursuant to an oral agreement. (First Am. Compl., Dkt. 12, ¶ 7). In 2003, Bishop and Gosiger memorialized their relationship in a "Distributor Contract." (First Am. Compl., Dkt. 12, ¶ 7).

The Distributor Contract established the general relationship, duties and responsibilities of the parties, and provided (among other things) that Bishop was a distributor for all Designated Products described on Schedule B, attached thereto, "as the same may be amended from time to time by the parties." The Distributor Contract also defined important terms governing the method by which Bishop would earn commissions (*e.g.*, Commission, Completed Order, Net Selling Price), and provided a calculation for splitting commissions among multiple representatives, in limited

1

circumstances. The Distributor Contract also includes terms relating to confidential information, indemnity between the parties, dispute resolution, choice-of-law, termination of the agreement, and modification of the agreement.

The following provisions of the Distributor Contract are relevant to this Motion:

Section 7.1, governing Resolution of Disputes:
> [Gosiger] and [Bishop] shall act in good faith to seek the resolution of all differences arising under this Agreement . . . . If mediation is not successful in resolving the dispute, the dispute shall be submitted to arbitration before the American Arbitration Association in Dayton, Ohio in accordance with its Commercial Arbitration Rules . . . .

Section 1.5, governing Designated Products:
> "Designated Products" are the products exclusively assigned to [Bishop] for sales in the Territory as described on the attached Schedule B, as the same may be amended from time to time by the parties.

Section 10.1, governing Modifications:
> . . . Schedules A, B, C and D may be modified by [Gosiger] on thirty (30) days prior notice to [Bishop].  This Agreement otherwise may not be amended or modified in any respect except by written instrument signed by a duly authorized officer or representative of [Bishop] and by a duly authorized officer of [Gosiger].

Section 12.4, governing Notice:
> Any notice, request, demand, or other communication made pursuant to this Agreement shall be in writing and shall be mailed, sent by private commercial carrier, transmitted by telecopy (fax) or personally delivered to the other party . . . .

Section 12.5, governing Choice of Law:
> This Agreement shall be deemed to be made and entered into in the State of Ohio and shall be governed and construed under and in accordance with the laws of the State of Ohio.

Schedule B, governing Commissions (Designated Product, and Commission rate):
> Euroturn Multi-spindle Automatics    10%

In his Complaint (and an Affidavit opposing Defendant's Motion), Bishop explains that, in or around February 2005, he and Gosiger wanted to "compliment their representation" of the Euroturn Multi-Spindle machine line.  To that end, Bishop contacted BTB Transfer s.r.l, an Italian

2

company, regarding Bishop and Gosiger representing BTB in the United States.  Gosiger became

BTB's North American distributor in 2006.  Bishop contends that Kevin Hayes, then-president of

Gosiger's import division, assured Bishop that he would receive 5% commission on his sale of BTB

machines.

For years while working under the Distributor Contract, Bishop called upon a wholly-owned

subsidiary of Caterpillar, Inc., known as Anchor Coupling, Inc. ("Anchor").  Anchor needed to

purchase machines to produce "stems" and "shells" – parts used on hydraulic lines, hoses, and

systems.  Bishop describes numerous efforts to sell Euroturn Multi-spindle machines to Anchor, but

none resulted in a sale.  Once authorized to sell BTB machines, Bishop advised Anchor of the

availability of BTB's rotary machines for the manufacture of stems and shells.  Anchor was

interested in receiving a quote for both Euroturn Multi-Spindle and BTB rotary machines. Bishop

advised Hayes of Anchor's interest.  In his Complaint, Bishop explains:

> Bishop told Mr. Hayes that he expected to receive a commission if any BTB machines
> were sold to [Anchor].  Mr. Hayes assured Bishop that if BTB rotary machines were sold
> to [Anchor], Bishop would be paid a commission of 5 percent of the sale price and if
> Euroturn Multi-Spindle machines were sold to [Anchor], Bishop would receive his
> standard commission for Euroturn sales. (First Am. Compl., ¶ 26).

On February 17, 2007, Bishop and a representative of Gosiger called upon Anchor to present

a quote on BTB machines for the manufacture of stems and shells.  Throughout 2007 and 2008,

Anchor and Gosiger negotiated Anchor's purchase of BTB machines for delivery to facilities in

Michigan and Mississippi.  Bishop believes these negotiations culminated in purchase orders for 16

machines, with 4 already having been delivered in Michigan, and the remaining 12 to be delivered

by early 2010 in Mississippi.

Bishop claims that in April, 2007, Hayes assured Bishop that he would receive "the full five percent commission and that there were no dealers or other sales representatives in either Mississippi or Michigan with whom Bishop would have to split his commission."  (First Am. Compl. ¶ 33).

On June 14, 2007, at Bishop's request, Hayes sent an email to Bishop, stating in pertinent part:

> Please take this letter as our confirmation of protection for Bishop & Associates on the **present Anchor Coupling BTB program**.  This agreement is **specific to this program only** and will extend to the end of calendar year 2007.  Any required discounting will be shared at a negotiated rate and for any machines delivered outside the Michigan territory consideration must be given to the dealer who is responsible for the territory in which the machine is to be installed.  As per our **standard contractual terms,** this would equate to a split of 2/3 of the agreed upon commission to Bishop & Associates and 1/3 to the recipient of the machine.  Your commission prior to any required split or discount will be 5% of the net sales price of the machines excluding tax, duty and freight charges and will be payable within 45 days of receipt of full payment of the customer.

Bishop contends that the "specific to this program" language establishes that the Anchor Coupling BTB program was a separate and distinct oral contract, rather than a modification of the Distributor Contract (*i.e.*, an addition to Schedule B to define the commission (5%) for the newly Designated Products (BTB rotary machines)).  On June 15, 2007, Bishop sent a response to Hayes, indicating that there needed to be "some latitude on timing."  That email also questioned the method of splitting commissions:

> When this program first began, back in 2006, you had noted there would be no problem if any machines went to [Mississippi] **as we had no dealers / reps down there**.  You were more concerned about Michigan, Brad's group wanting to jump in and get involved with the program, but that was worked out as it was **not officially their area**.  But there was nobody in the [Mississippi] area, so you had told me there would be no problem if any of the machines went there.  **So it would seem to me, as it has been how it's gone in the past,** that since this program was in the works well before this new dealer was signed up, they should not be involved with this program or entitled to any commission. . . . **That was never an issue in the protection letter earlier as there was no dealer there**.

\* \* \*

> Have you been able to gain any ground within Michigan for the BTB or Nomura lines? . . . . I would like to have them and could really use them. . . . **[W]hat are the chances for me to gain some more product lines?**?
> (emphasis added).

In his response, Hayes reminded Bishop that "**[c]ontractually, we are obligated [to split commissions] and it would be unethical to handle it any other way**. I certainly would not cut out Steve Bishop if the shoe were on the other foot." (emphasis added).

On September 26, 2008, Gosiger terminated Bishop's "distributorship contract," effective October 26, 2008.

On April 23, 2009, Bishop received a check from Gosiger in the amount of $298,499.73, representing commissions on the four BTB machines installed in Anchor's Michigan facility. He returned it to Gosiger because he believed that cashing the check would waive his right to receive commissions for the remaining twelve BTB machines. In the June 3, 2009 letter returning the unnegotiated check, Bishop explained that he was "selling very expensive machines for Gosiger and sales occur only now and then. It takes years for me to develop relationships with potential customers and even though I am working hard and calling on customers over a long period of time, sales of these expensive machines only happen now and then." Indeed, Bishop was "particularly disappointed" in Gosiger's treatment of the BTB sales to Anchor, as he acknowledged spending "years developing the relationship with . . . [Anchor]."

On June 5, 2009, Bishop filed a Complaint asserting claims of breach of contract, conversion, promissory estoppel, unjust enrichment, declaratory judgment, and statutory damages for failure to pay commissions owed for the sales of both Euroturn and BTB machines. Gosiger filed a Motion to Dismiss or Stay Pending Arbitration, arguing that the Distributor Contract, which undeniably

governs commissions for sales of all Euroturn machines, contained an agreement to arbitrate all disputes in Dayton, Ohio.  In response, on August 6, 2009, Bishop filed his First Amended Complaint, eliminating claims relating to the sale of Euroturn machines.  Bishop contends that, although his First Amended Complaint is still replete with references to and discussion of the Distributor Contract, and the relationship between Gosiger and Bishop created thereunder, sales of BTB machines arise under a wholly separate oral contract, which did not contain an agreement to arbitrate disputes.  Gosiger again moves to dismiss or stay pending arbitration, arguing that the arbitration agreement in the Distributor Contract encompasses the instant dispute.

On January 10, 2010, Magistrate Judge Majzoub issued a Report and Recommendation in which she recommended that this Court deny Gosiger's Motion because it has not proven, as a matter of law, that the sales of BTB machines arise under the Distributor Contract.  Gosiger filed Objections to the Report and Recommendation, and Bishop filed a Response to Gosiger's Objections.  Pursuant to Rule 72(b), I have reviewed the arguments *de novo*, and, for the reasons that follow, I now REJECT Magistrate Judge Majzoub's Report and Recommendation, GRANT Gosiger's Motion to Dismiss or Stay Pending Arbitration, and STAY the proceedings pending arbitration.

I will address each of the arguments in Gosiger's Motion *de novo*.

## II.  ANALYSIS

### A.    Standard of Review

The Federal Arbitration Act (the "Act") provides that arbitration clauses in commercial contracts "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  If a court determines that the cause of

action is covered by an arbitration clause, it <u>must</u> stay the proceedings until the arbitration is complete. 9 U.S.C. § 3. The Sixth Circuit also allows district courts to dismiss an action where all of the claims are arbitrable. *See, e.g., Hensel v. Cargill, Inc.*, 198 F.3d 245, 1999 WL 993775 (6th Cir. 1999) (unpublished decision). In addition, even though a Court may not compel arbitration in a foreign jurisdiction, it may stay the litigation pending arbitration in the chosen forum. *See, e.g.,* 57 WILLISTON ON CONTRACTS, Commercial Arbitration Contracts, § 57.54 (Agreement for arbitration in another jurisdiction).

The Sixth Circuit has articulated the appropriate test to determine whether to stay a case pending arbitration:

> When considering a motion to stay proceedings and compel arbitration under the Act, a court has four tasks: first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.

*Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 392 (6th Cir. 2003) (quoting *Stout v. J.D. Byrider,* 228 F.3d 709, 714 (6th Cir. 2000)).

In this case, Bishop concedes that the Distributor Contract includes an agreement to arbitrate all issues "arising under" that agreement. The third and fourth prongs are not at issue. Thus, the only question for this Court is whether Bishop's claims related to unpaid commissions on BTB machines are arbitrable under the provision in the Distributor Contract. Gosiger submits several theories, each of which it claims requires submission of Bishop's claims for arbitration: (1) the parties incorporated the American Arbitration Association ("AAA") Rules governing commercial arbitration into the Distributor Contract, which Rules require that the arbitrator determine questions

of arbitrability, rather than the Court; (2) no separate "BTB Agreement" was ever formed, but rather, the BTB product sales were made pursuant to an oral modification to the Distributor Contract; or (3) the Distributor Contract was, at least, an umbrella agreement governing the parties' relationship. Bishop claims that the BTB Agreement is separate, and the Distributor Contract should not be read as an umbrella agreement.

"The Arbitration Act establishes that, as a matter of federal law, **any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration,** whether the problem at hand is the **construction of the contract** language itself, or an allegation of waiver, delay, or a like defense to arbitrability.**"** *Moses H. Cone Mem'l Hosp. v. Mercury Constr.* Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (emphasis added); *Fazio,* 340 F.3d at 392; *Nestle Waters North Am. v. Bollman*, 505 F.3d 498, 503 (6th Cir. 2007) ("[w]e examine arbitration language in a contract in light of the strong federal policy in favor of arbitration, resolving any doubts as to the parties' intentions in favor of arbitration.").  In fact, a Court may not deny a motion to stay or dismiss "**unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute**."  *AT&T Technologies, Inc. v. Comms. Workers,* 475 U.S. 643, 650 (1986); *Nestle Waters,* 505 F.3d at 504.

This Court recognizes, however, that "the federal policy in favor of arbitration is not an absolute one."  *Id*. (citation omitted).  The Supreme Court has explained that "[w]hile ambiguities . . . should be resolved in favor of arbitration, we do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated."  *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294, 122 S.Ct 754, 151 L.Ed.2d 755 (2002) (citation omitted).

8

Rather than require Gosiger to establish its arguments "as a matter of law", I will, as required, resolve doubts regarding the scope of arbitrability under the Distribution Contract in favor of arbitration, without overriding the "clear intent of the parties," or reaching a result "inconsistent with the plain text" of any contract.[1]

## B. Where Claims Arguably Arise Out of the Distributor Contract, AAA Rules Require Arbitrability To Be Determined By Arbitrator

Gosiger first argues that the arbitrator, not the Court, should determine whether the claims in Bishop's lawsuit fall within the scope of the arbitration agreement. The arbitration clause applies the AAA Rules for Commercial Arbitration. Rule 7(a) of those rules states that an arbitrator determines the scope of his or her own jurisdiction.

As Bishop notes, however, although doubts regarding the scope of an arbitration clause (i.e. *what* is arbitrable) must be resolved in favor of arbitration, the presumption is reversed when determining *who* should determine arbitrability. The Supreme Court explained that "[c]ourts should not assume that parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514. U.S. 938, 944, 115 S.Ct. 1920 (1995) (citing *AT&T Technologies*, 475 U.S. at 649).

---

[1]Although the <u>facts</u> must arguably be construed in the light most favorable to Bishop under the standards related to Motions under Fed. R. Civ. P. 12(b)(6) and 56(c), the Supreme Court clearly explains that <u>doubts about the legal conclusions drawn from those facts must favor arbitration</u>. For this reason, although Bishop repeatedly argues that this Court must accept his "uncontested facts" – that the Distributor Contract covered only sales of Euroturn machines, and was never intended to reach the sale of BTB machines (which he states were covered under a separate oral contract) – Bishop's statements are not facts the Court must accept as true, but are legal conclusions that the Court must decide for itself. *See Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007) ("While all the factual allegations of the complaint are accepted as true, we need not accept as true legal conclusions or unwarranted factual inferences.) (internal quotation and citation omitted).

At least six federal Circuit Courts hold that when a contract requires arbitration pursuant to AAA Rules – which expressly give the question of arbitrability to the arbitrator – "it clearly and unmistakably vests the arbitrator, and not the district court, with authority to decide which issues are subject to arbitration." *Bollinger Shipyards Lockport LLC v. Northrup Grumman Ship Sys., Inc.*, 2009 WL 86704 (E.D. La. 2009) (citing cases from the First, Second, Eighth, and Eleventh Circuits, as well as two federal district courts). *See also, e.g., Fallo v. High-Tech Institute*, 559 F.3d 874 (8th Cir. 2009); *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1373 (Fed. Cir. 2006). And, although the Sixth Circuit has not ruled on this issue, several district courts in the Sixth Circuit have followed this emerging line of authority. *See, e.g., Book Depot Partnership v. Am. Book Co.*, Case No. No. 3:05-CV-163, 2005 WL 1513155 (E.D. Tenn. June 24, 2005) (assuming the Sixth Circuit would agree with emerging line of authority); *Morsey Constructors, LLC v. Burns and Roe Enterprises, Inc.*, Case No. 5:08-CV-23-R, 2008 WL 3833588 (W.D. Ky. Aug. 13, 2008) ("agreeing to settle contract disputes according to the rules of the AAA provides a 'clear and unmistakable' delegation of scope-determining authority to an arbitrator") (citation omitted); *Electrolux Home Prod., Inc. v. Mid-South Elec., Inc.*, Case No. 6:07-CV-016-KKC, 2008 WL 3493466 (E.D. Ky. Aug. 11, 2008) (applying arbitrability delegation principle *sua sponte*).

Bishop argues that this Court cannot simply accept the fact that *some* contract between the parties contains an arbitration clause incorporating the AAA Rules. Instead, he says, I must first determine if his claims arise out of the Distributor Contract or a separate oral contract (which he says contains no agreement to arbitrate). I agree; without evidence that the arbitration clause in the Distributor Contract encompasses the instant dispute, the arbitration provision contained therein is of little import.

As discussed below, however, when resolving doubts about the scope of arbitrability in favor of arbitration, I find that Bishop's claims arguably fall within the contemplated scope of the Distributor Contract. I therefore leave the final contract interpretation to the AAA arbitrator. If he or she should interpret the contract(s) at issue and side with Bishop – that is, find that the claims arise out of a separate oral contract not subject to arbitration – Bishop can return to this Court (or another appropriate venue) for a determination on the merits.

**C.     Resolving Doubts In Favor of Arbitrability, Bishop's Claims Are Arbitrable**

**1.     The Distributor Contract May Be An Umbrella Agreement**

Bishop argues that the Distributor Contract is distinct from the alleged oral contract governing his representation of BTB machines. Thus, he argues, the arbitration provision in the Distributor Contract is inapplicable to disputes regarding unpaid commissions for BTB machines.

Defendant counters that the Distributor Contract is, at least, an "umbrella agreement governing the parties' overall relationship." Where parties enter into more than one agreement, and only one includes an arbitration clause, courts must determine if it is an "umbrella agreement" governing the entire relationship. The proper method of analysis is to "ask if [the] **action could be maintained without reference to the** contract or **relationship at issue**." *Nestle Waters,* 505 F.3d at 504 (citation omitted) (emphasis added); *see also Fazio*, 340 F.3d at 395 (where activities were "contemplated by [the] agreement," and the "lawsuit by necessity must describe" the relationship and obligations under the agreement, arbitration clause applies).

In *Nestle Waters* – a case presenting the question of "how an arbitration clause applies when found in one of several valid agreements that arose in the course of a single transaction or relationship" – the Sixth Circuit ruled that an arbitration provision in a Purchase and Sale Agreement

11

("PSA") applied to a dispute under a subsequent Deed because "proper interpretation of the Deed could not be determined without reference to the PSA and the ongoing relationship." *Id.* The Court found it significant that (a) the PSA "created the relationship between [the parties] in the first place" and governed their obligations to each other; (b) the arbitration clause was contained in the *first* contract between the parties;[2] (c) the PSA contemplated the execution of the deed; and (d) definitions of disputed terms were in the PSA, not in the Deed.

Gosiger argues that these factors are present in this case. When resolving doubts in favor of arbitrability, I must agree. The Distributor Contract established Bishop's role as a distributor, defined the parties' rights and obligations to each other, contemplated that Bishop may distribute additional product lines, and defined terms necessary for calculation of commissions (*i.e.* commission, completed order, net selling price).[3]

---

[2]The Court distinguished *Alticor, Inc. v. Nat'l Union Fire Ins. Co.*, 411 F.3d 669 (6th Cir. 2005), a case relied upon by Defendant, because the arbitration agreement in that case was in a later agreement, while the dispute involved rights and obligations stemming from an earlier agreement. Defendant's analogy to *Alticor* in this case suffers from the same flaw.

Defendant also argues that *Alticor* advises that, should the parties have intended to arbitrate claims arising under <u>any</u> contract, they could have expressed that intent clearly in the contract. Again, in *Alticor*, the sequence of the contracts was essential to that finding. In this case, the parties contemplated <u>modification</u> of the Distributor Contract for Bishop's representation of new products – there is no indication that they anticipated creation of a <u>separate</u> contract for such distribution, and therefore there was no reason to incorporate even broader arbitration language.

[3]Bishop acknowledges that these terms are defined only in the Distributor Contract. But, rather than look to that contract for their definitions, he suggests a Court should look to the "past practices between the parties" – specifically, "their past performance under the [Distributor Contract]." Moreover, although Bishop's First Amended Complaint removed claims for unpaid commissions for Euroturn machines (admittedly in an attempt to avoid the Distributor Contract's arbitration clause), he continues to reference the Distributor Contract and the parties' ongoing relationship throughout his First Amended Complaint.

Through these references to the Distributor Contract in his Complaint and argument, I find, as Defendant suggests, Bishop essentially concedes that he cannot maintain his action "**without reference to the contract or relationship at issue**."

Bishop attempts to limit *Nestle Waters* to matters where the second contract is "required by" the first, and where both contracts were executed at or near the same time as part of a single transaction. I find these distinctions immaterial. The Sixth Circuit looked instead at whether the contracts defined an "**ongoing relationship**," or arose "in the course of a single transaction or **relationship**." In this case, even if I presume the existence of a separate contract for the sale of BTB machines, the parties' ongoing relationship was essentially unchanged.[4]

Because I must resolve all doubts in favor of arbitrability, even if two contracts exist, the Distributor Contract arguably served as an umbrella agreement governing the parties' relationship.

## 2. The Distributor Contract May Have Been Modified

Alternatively, Defendant argues that the agreement that Bishop would receive commissions for BTB sales modified the Distributor Contract, and was not a separate contract. The Distributor Contract states, "Schedules A, B, C, and D may be modified by [Gosiger] on thirty (30) days prior notice to Representative." Schedule B sets forth the Designated Products covered by the Distributor Contract (Euroturn) and the commissions (10%). Bishop alleges that he and Gosiger orally agreed

---

[4]Bishop's role as a distributor under both agreements – if there were in fact two agreements – distinguishes this case from many of the cases he relies upon. *See, e.g., Buell Door Co. v. Architectural Sys., Inc.*, Case No. 3:02-CV-721-AH, 2002 WL 1968223 (N.D. Tex. Aug. 20, 2002) (plaintiff was a sales representative under first contract, and customer under second; the court found the "difference in the relationships" under the contracts was "[p]erhaps the most pertinent factor" in holding that the arbitration clause from the first contract did not apply to disputes under the second); *Cambio Health Solutions, LLC v. Sloate*, 70 Fed. App'x. 816 (6th Cir. 2003) (arbitration clause from LLC Agreement does not encompass dispute under separate Employment Agreement).

Bishop also argues that his (admittedly) "continuing relationship" with Gosiger "materially changed" because he was an exclusive distributor of Euroturn agreements, but a non-exclusive distributor of BTB machines. He has cited no authority, however, for the proposition that this difference is material.

that Bishop would be entitled to receive commissions (5%) on another type of machine (BTB). Gosiger suggests that agreement was a modification of Schedule B, as permitted under the contract.

Bishop states in an Affidavit that "the BTB Agreement was a separate and distinct contract from the [Distributor Contract]." He further claims "Gosiger never notified [him], either orally or in writing, that it was amending any portion of the [Distributor Contract] or its Schedules to reflect the addition of another line of machines." I need not, however, accept Bishop's <u>legal conclusions</u> regarding the existence of a separate oral contract, or the modification (or lack thereof) of the Distributor Contract. *Directv, Inc.*, 487 F.3d at 476. Thus, these arguments are unpersuasive.

Bishop also argues that the Distributor Contract never "referenced or contemplated" the sale of BTB machines. I disagree. Although the contract did not specifically identify the BTB product line, it certainly <u>contemplated</u> that Bishop could distribute additional products. In fact, Bishop described the addition of the BTB product line as something to "compliment" his Euroturn representation. Further, his correspondence with Hayes beginning in April, 2007 suggests that both parties understood that their "standard terms" were applicable – including splitting commissions with other territory representatives.[5] Bishop also referenced "how it's gone in the past", and asked how to "gain some more product lines." These statements suggest that the parties intended BTB to be an additional product line, expanding upon their ongoing contractual relationship, rather than a "separate and distinct" contract "without regard to any provision in the [Distributor Contract]."

Next, Bishop argues that the Distributor Contract required all modifications to be in writing. He claims that Gosiger never indicated that the June 14, 2007 email (the only "writing" granting

---

[5]Bishop claims that Hayes represented that Bishop would not be required to split commissions because there were no representatives in Mississippi with which to split them – <u>not because those contract terms were inapplicable</u>.

Bishop a distributorship of BTB machines) was intended to modify the Distributor Contract, and he never agreed to any modification of that contract. I note, however, that the contract does not appear to require Bishop's approval for modifications to the Schedules. Thus, it is possible that the June 14, 2007 email served as a unilateral modification of Schedule B – permitting Bishop to sell BTB machines, and earn 5% commissions. A question remains as to whether the other terms (regarding timing of payment and contract duration) should be regarded as proposed terms, to which Bishop did not assent in writing. I reserve that contract-interpretation question for the arbitrator.

Alternatively, the Distributor Contract *can be read* to permit Gosiger's unilateral oral modification of Schedule B. Specifically, Section 10.1 states that any Schedule may be modified by Gosiger on thirty days prior notice to Bishop. "*[O]therwise*" an amendment requires a written agreement signed by both parties. Section 12.4 is a general clause requiring notices to be in writing. The contract applies Ohio law. Ohio applies the well-established contract-interpretation principle that specific provisions take precedence over more general provisions. *See Gibbons-Grable Co. v. Gilbane Building Co.*, 34 Ohio App.3d 170, 175, 517 N.E.2d 559 (1986). Thus, Gosiger can argue that Section 10.1 is specific – requiring written modifications of most contract provisions, but permitting unilateral oral modifications of any Schedule – and takes precedence over Section 12.4's general written-notice provision.

Even if the contract is read to require written notice of any modification to Schedule B, and even if the June 14, 2007 email did not serve as that notification, the parties may have waived this requirement. It is generally accepted that a "no-oral-modification" provision can be waived by the parties through subsequent oral agreement or passive approval:

> Despite principles of freedom of contract and the potential benefit of avoiding false claims, the no-oral-modification clause has not garnered favor in the law. Indeed, this

15

clause, which purports to erect a kind of 'private' statute of frauds for contracting parties, has generally not been given full effect by courts. . . . Accordingly, it has been held that the clause itself can be waived by oral agreement like any other term in a contract.

*Fields Excavating, Inc. v. McWane, Inc.*, Case No. CA2008-12-114, 2009 WL 3721013, *4 (Ohio App. Nov. 9, 2009) (citation omitted). *See also Franz v. Van Gunten*, 36 Ohio App.3d 96, 99, 521 N.E.2d 506 (1987); *Strawser v. Vulic,* Case No. 92AP-1640, 1993 WL 238844, *4 n.1 (Ohio App. June 22, 1993) ("a party which passively accepts the benefits of an oral modification to a written contract waives the protections provided by a no-oral-modification clause.").

**D.     The Arbitration Clause is Not Unconscionable**

Bishop argues that, even if the Court finds the arbitration clause encompasses the instant dispute, it should not be enforced because it is unconscionable.  Although Bishop cites only Michigan law and federal law outside of this Circuit in support of his argument, Ohio law governs this question pursuant to the choice-of-law provision in the Distributor Contract.  *Great Earth Companies, Inc. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002) ("state law governs generally applicable contract defenses to an arbitration clause, such as . . . unconscionability") (internal quotation, alteration, and citation omitted); *see also Stinger v. Chase Bank USA, NA*, 265 Fed. App'x. 225 (5th Cir. 2008) (applying law of state identified in choice-of-law provision to determine unconscionability of arbitration provision).

"The 'basic test of unconscionability of contract is whether under circumstances existing at the time of making of contract and in light of general commercial background and commercial needs of particular trade or case, clauses involved are so one-sided as to oppress or unfairly surprise [a] party.'" *Neubrander v. Dean Witter Reynolds, Inc.*, 81 Ohio App. 3d 308, 311-12, 610 N.E.2d 1089 (1992) (quoting Black's Law Dictionary (5th Ed. Rev. 1979)).  To establish that the arbitration

clause is unconscionable, Bishop must show that the provision is both procedurally and substantively unconscionable. *Id*. But, "in examining an arbitration clause, [the] court must bear in mind the strong presumption in favor of arbitrability and resolve all doubts in favor of arbitrability." *Id*.

In support of his argument, Bishop claims that (1) the Distributor Contract is a contract of adhesion; (2) the arbitration provision imposes "substantial arbitration costs"; and (3) the arbitration clause purports to deny Bishop certain statutory remedies by excluding "exemplary and punitive damages" from any potential recovery.

Allegations of unequal bargaining power "have been met with considerable disregard by the United States Supreme Court." *Id*. (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991)). In this case, as in *Neubrander*, there is no indication that [Bishop], a businessman, "was coerced or defrauded into agreeing to the arbitration clause." *Id*. He, like Neubrander, provided "mere conclusory allegations" that the contract as a whole was adhesive. Moreover, as Gosiger points out, Bishop reviewed the contract before signing it. He had also been working without a contract for approximately two years, he requested that Gosiger draft a written agreement confirming their relationship, and he has not shown that Gosiger refused to continue their working relationship if he rejected the arbitration provision. Thus, Bishop has not demonstrated that the arbitration provision was procedurally unconscionable.

Bishop also argues that the costs of arbitration render the clause substantively unconscionable. He claims that, pursuant to the AAA fee schedule, he must pay $12,000 in initial fees, and the arbitration will be more costly because it requires three arbitrators. Gosiger disputes Bishop's calculation and interpretation of the AAA Rules, and claims that only one arbitrator is

required.  In either event, Bishop has not produced evidence of the expected cost differential between arbitration and litigation in court.  Ohio courts have held that "generic information contained in AAA Commercial Rules and unsupported statements of the parties possible costs were not enough to satisfy the party's burden of providing factual proof that the costs were prohibitively expensive."  *See English v. Cornwell Quality Tools Co.*, 2005-Ohio-6983, 2005 WL 3556281 (Ohio App. Dec. 30, 2005) (quotation and internal alteration omitted).  *See also Post v. Procare Automotive Service Solutions*, 2007-Ohio-2106, 2007 WL 1290091 (Ohio App. May 3, 2007) ("the mere 'risk' that a party will be saddled with prohibitive cost is too speculative to justify the invalidation of an arbitration agreement.").  Moreover, "proof of cost alone is not sufficient to prove that arbitration would be a prohibitively expensive and unreasonable alternative to litigation." *English, supra*, (quoting *Garcia v. Wayne Homes, LLC*, 2002-Ohio-1884 (Ohio App. 2002)) (recognizing that litigating large claims can result in substantial legal fees and costs that exceed arbitration).  In this case, Bishop is a business man, suing for millions of dollars in unpaid commissions – this undermines his argument that the arbitration costs are prohibitive.  *See Post*, *supra* (finding plaintiff's $120,000 annual salary failed to support his prohibitive-costs argument). *See also* AAA Rule 49 ("The AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees.").

Finally, in his Response, Bishop mentions that the arbitration clause's denial of punitive and exemplary damages renders it substantively unconscionable.  He fails to develop this argument in his Brief or cite any authority in support of this proposition.  "It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to put flesh on its bones." *Meridia Prods. Liab. Lit. v. Abbott Labs.*, 447 F.3d 861, 868 (6th Cir. 2006) (quoting *McPherson*

*v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.1997)).  I therefore find that Bishop has abandoned this argument by failing to develop it with any discussion of facts or citation of authority.  *McPherson,* 125 F.3d at 995-96 ("[I]ssues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (citation omitted).  *See also E. Liverpool v. Columbiana Cty. Budget Comm.*, 116 Ohio St. 3d 1201, 876 N.E.2d 575, ¶ 3 (party's omission of an argument from its brief deems it abandoned).

**E.      The Arbitration Provision Survives Termination of the Distributor Contract**

In a last-ditch effort to avoid arbitration, Bishop argues that the Distributor Contract was terminated on September 26, 2008, and "[n]othing in the termination letter indicates that the . . . arbitration provision [survives the termination]."  The cases cited by Bishop, however, do not support his argument.  The Supreme Court, in *Nolde Brothers, Inc. v. Local No. 358*, 430 U.S. 243, 255 (1977), held that an arbitration provision survives termination of the agreement unless "negated expressly or by clear implication."  *See also id.* at 253 ("[i]n the absence of some contrary indication, there are strong reasons to conclude that the parties did not intend their arbitration duties to terminate automatically with the contract."); *Litton Financial Printing Division v. N.L.R.B.*, 501 U.S. 190, 205 (where contract incorporates broad arbitration language, "if a dispute arises under the contract  . . . , it is subject to arbitration even in the postcontract period").

The Supreme Court in *Litton* explained that a post-expiration dispute arises under a contract "where it involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement."  Bishop argues that arbitration should not be compelled because the

19

"BTB commissions were not due until after the [Distributor Contract] was terminated." But, it is undisputed that (1) the relevant "facts and occurrences" (i.e. Bishop's alleged agreement regarding BTB sales, and the alleged sale of BTB machines to Anchor) occurred before contract termination; and (2) Bishop's right to commissions must have vested before the contract expired or otherwise survived its expiration, or he would have no claims to litigate. Thus, because the arbitration provision in the Distributor Contract is broad, the claims arguably arise under the contract, and there is no indication that the parties intended the arbitration provision to terminate with the contract, I find the arbitration provision survives termination for disputes arising under the contract.

## III.  CONCLUSION

For the foregoing reasons, I am unable to say with positive assurance that the arbitration clause in the Distributor Contract is not susceptible of an interpretation that covers the instant dispute. *See AT&T Technologies,* 475 U.S. at 650. Therefore, in accordance with the Federal policy favoring arbitration, I hereby REJECT Magistrate Judge Majzoub's Report and Recommendation, GRANT Defendant's Motion to Stay or Dismiss Pending Arbitration, and STAY the proceedings to permit the parties to proceed to arbitration in their chosen forum.

**IT IS SO ORDERED.**

Date:    March 4, 2010                          s/ John Feikens
                                         John Feikens
                                         United States District Judge

| Proof of Service |
| --- |
| I hereby certify that the foregoing order was served on the attorneys/parties of record on March 4, 2010 by U.S. first class mail or electronic means.<br>                    s/Carol Cohron<br>                    Case Manager |